HAWES AND DUNCAN, EX'RS, v. B. H. FOOTE ET ALS.

(Case No. 1812.)

1. CONSTRUCTION OF A WILL.— A will, after making specific bequests, contained this language: "I also give to said legatees (meaning appellees) my cart, all my cattle (except oxen), and any horses of mine they may have in possession at the time of my death." Over two years after making the will the testator died, leaving an estate, part of which consisted in home stock cattle, in the possession of the legatees to whom the above quoted language referred, and an interest, as partner, in other cattle in possession of a partner, and still others purchased to be fattened and sold as a means of profitably consuming his grain crop, for account of the testator and a partner. *Held*, that construing the will in view of all the facts (which are very fully detailed in the opinion), the word "*cattle*" did not embrace cattle bought to be fattened by the testator.

2. PRACTICE — JURISDICTION — CONSOLIDATION OF SUITS.— Suit was brought in the probate court, and the probate judge being disqualified, from interest, the case was transferred to the district court. Afterwards the plaintiff brought another suit in the district court against the same defendants. Both involved the construction of a clause in a will under which plaintiffs claimed specific property. *Held:*

(1) That a motion to transfer the suit first brought, back to the probate court, because the disqualification of the judge had ceased, was properly overruled.

(2) The district court had full jurisdiction to make, not only any order the county court might have made, but to consolidate the two suits and determine finally the construction of the will.

(3) The authority of the district court on a consolidation of the two suits was not limited to a construction of the will, but extended to the final adjudication of all rights of property claimed by the contestants under the will.

APPEAL from Wharton. Tried below before the Hon. Wm. H. Burkhart.

This suit arose out of the following clause of the will of Alexander: "I also give to said legatees (meaning appellees) my cart, all of my cattle (except oxen), and any horses of mine they may have in possession at the time of my death."

Alexander died January 12, 1879. November 19th appellees filed a petition in the district court, sitting as a court of probate (E. Hawes, one of the defendants, being county judge), wherein they set out said provision of the will, and claimed thereunder to be entitled to all the cattle, except oxen, owned by Alexander at his death; alleged the estate to be worth $27,301, and solvent, and that at the time of Alexander's death his cattle consisted of three hundred and twenty-six head; fourteen head of stock cattle, and one hundred and seventy-six beeves, on Bear Camp place, and twenty-five stock cattle and one hundred and eleven beeves on the Fleetwood place, stating their value. They further stated that Alexander's executors had failed to turn over to them said cattle, or to recognize said bequest, and that they had sold part of the cattle and used the proceeds to pay off the general indebtedness of the estate; and they prayed that the executors be required to turn over to them the cattle remaining unsold, and to pay them the value of those sold.

On 16th December, 1880, by an amendment, appellees withdrew from the original motion the prayer for judgment for the value of the cattle sold, reserving the right to sue therefor, and prayed that the executors be required to turn over to them the fifty-six head remaining in kind in their possession.

The executors answered the motion, 1st, by denying that they had any cattle belonging to the estate in their possession, except sixteen head, and denying that these formed any part of the bequest to the Footes.

2d. They claimed that by the proper construction of the will only cattle remaining in the possession of the Footes at the death of Alexander passed by the will.

3d. Their third defense was that Alexander had entered into partnership contracts with one Anderson and with one Roan, of such a nature as to preclude him from disposing by will of the cattle on the Fleetwood and Bear Camp places; that all of the cattle mentioned by plaintiffs were put into said partnerships by Alexander after the will was made and before his death, and therefore could not pass by the terms of the will. They further alleged that Roan and Anderson had sold said cattle, and upon an accounting with the executors and settlement of the plantation accounts between Alexander and Roan and Anderson nothing remained.

May 16, 1881, the Footes filed a suit in the district court against the executors and residuary legatees, asking for a construction of the will, and to recover the value of the cattle which had been sold.

The answers of the defendants thereto were substantially the same as they had made to the motion on the probate side of the docket, No. 1101.

In December, 1882, there was a motion made by the executors to remand case No. 1101 to the county court, a new county judge having been elected. There was also a motion by appellees to consolidate the two cases Nos. 1115 and 1101.

Motion to remand was overruled, and the cases were consolidated by the court.

Plaintiff, after consolidation, filed an amended original petition in lieu of all his pleadings, praying for a construction of the will; for the value of all the cattle sold by the executors or by Roan and Anderson, and that the cattle remaining in kind be turned over to them.

At the June term, 1883, the court sustained demurrers of the plaintiffs and defendants to all of the pleadings of both parties that sought to have the court do more than construe the will, and upon final hearing adjudged that the term *cattle* in the will included everything of the neat cattle kind that Alexander owned at the time of his death, except oxen, and also gave an opinion on the contracts between Alexander and Anderson and Roan, and, without adjudging that the plaintiffs recover anything but costs, ordered that this judgment be certified to the county court for observance.

Both parties appealed, the executors without, and the appellees Foote *et al.* with, bond.

*Pearson & McCamly*, for appellants, on the construction of the will, cited: Philleo v. Holliday, 24 Tex., 38; Paul v. Ball, 31 Tex., 10; Brooks v. Evetts, 33 Tex., 732; Howze v. Howze, 19 Tex., 553; 1 Redf. on Wills, ch. X, p. 570 and notes, 571, 673; 2 Redf. on Wills, 130, sec. 36, and note 89, ch. 1, sec. 6; id., 141, sec. 17, note 32, citing Robertson v. Quiddington, 28 Beav., 529, and Lewis v. Langdon, 7 Sim., 421; Welder v. Keeler, 3 Paige, 167; 23 Am. Dec., 781, and notes; 48 N. Y., 74; 11 Blatch., 518; 16 Barb., 291; Cothran v. Marmaduke & Brown, from Lamar county, Austin, 1883; 3 Law Rev., No. 2, page 31; Houser v. Irvine, 3 Watts & Serg., 345; Brown's Ex'rs v. Higginbotham, 5 Leigh (Va.), 583; Mumford v. McKay, 24 Am. Dec., 34; Pearson v. Keedy, 43 Am. Dec., 164, and notes; 3 Redf. on Wills, sec. 37, p. 257, cl. 8; id., sec. 17, p. 136, ch. V; Moses v. Moses, 50 Ga., 9; *Ex parte* Williams, 11 Ves., 5.

That the partnership beef cattle could not pass by the specific legacy, they cited: Rogers *v.* Nichols, 20 Tex., 719; Greene *v.* Greene, 1 Ohio, 535; 13 Am. Dec., 645; Baird *v.* Baird, 31 Am. Dec., 406; Taylor *v.* Taylor, 4 Ves. Jr., 396; 4 Johns. Ch., 522; 6 Mass., 242; 6 Yerg., 20; 2 Redf. on Wills, ch. 1, § 6, art. 36 and note 89, p. 130; Clagett *v.* Kilbourne, 1 Black (U. S.), 346; Hoyt *v.* Sprague, 13 Otto, 624; Shanks *v.* Klein, 14 id., 21–24; 4 Miller (U. S.), 496; 2 Redf. on Wills, 134, sec. 4; id., 135, sec. 9, note 18; id., 132, sec. 11, notes 1 and 9, title *Specific Legacies;* Mumford *v.* McKay, 8 Wend., 442; Murray *v.* Murray, 5 Johns. Ch., 60; Menagh *v.* Whitwell, 52 N. Y., 168; Morrison *v.* Blodgett, 8 N. H., 238; Pearson *v.* Keedy, 6 B. Mon., 128; Egberts *v.* Woods, 27 Am. Dec., 245, and notes; Palmer *v.* Myers, 43 Barb., 513; S. C., 20 How., 10; Taylor *v.* Fields, 4 Ves., 396; 1 Story's Eq., 626; 3 Redf. on Wills, § 17, p. 136, ch. V; id., § 37, p. 257, clause 8; Martlett *v.* Jackson, 3 Allen, 287; Wilder *v.* Keeler, 3 Paige, Ch., 167; 41 Vt., 579; Brown's Ex'rs *v.* Higginbotham, 5 Leigh, 583; Sumner *v.* Hampson *et als.*, 8 Ohio, 328; Baird *v.* Baird, 1 Dev. & Bat. Eq., 524; *Ex parte* Williams, 11 Ves., 5; Pars. Part., 444 *et seq.;* 50 Ga., 9; Ball *v.* Britton, 58 Tex., 57.

They also quoted numerous authorities on propositions not discussed in the opinion.

*A. B. Peticolas*, for appellees, as to surviving partners, cited: Cock *v.* Carson, 45 Tex., 431; Carter *v.* Roland, 53 Tex., 540, 547; DeCaussey *v.* Bailey, 57 Tex., 665, 669; Higgins *v.* Rector, 47 Tex., 361; Alexander *v.* Lewis, 47 Tex., 481; 2 Redf. on Wills, 276; Fulton *v.* Thompson, 18 Tex., 278, 287; Parsons on Part., 440, 443.

As to construction of wills, he cited: Howze *v.* Howze, 19 Tex., 553, 556; Paul *v.* Ball, 31 Tex., 16; 2 Redf. on Wills, 457, 458, 532, 549, 583, 584; 1 Redf. on Wills, 337, 379; Wigram on Wills, 29, 46, 197; Redf. Am. Cas. on W., 127, 130; Collyer on Part., 243; Pearson *v.* Darrington, 18 Ala., 348; Carson *v.* Carson, 1 Met. (Ky.), 300; 3 Jarman on Wills, 467, 468, 469.

WALKER, P. J. COM. APP.— The clause of the will, the proper construction of which is the paramount question in this case, reads as follows: "I also give to said legatees my cart, all of my cattle (except oxen), and any horses of mine they may have in possession at the time of my death."

The court before whom the cause was tried without a jury, among its conclusions of fact, found that "there was a partnership existing

between said Alexander and W. J. Anderson and between the said Alexander and J. W. Roan in the cattle fattening business, and that said partnership was in existence at the date of said Alexander's death. I further conclude there were certain other cattle belonging to Alexander at the time of his death and when he made his will."

The court's conclusions of law were as follows: "That said will by its terms 'all of my cattle except oxen' means everything of the neat cattle kind that Alexander owned at the time of his death, including fattening cattle and beeves, oxen excepted; and the plaintiffs, Footes, became the owners thereof by the terms of the will, but that these plaintiffs are bound by such settlements as have been duly and legally made by virtue of the partnership alluded to in the conclusions of fact, by and between the executors and the surviving partners. I do also conclude it to be my duty under the law to certify my judgment to the county court for observance."

It is assigned as error by the defendants that the court erred in finding as a conclusion of law that Alexander's will, by its terms "all of my cattle (except oxen)," means everything of the neat cattle kind that Alexander owned at the time of his death, including fattening cattle and beeves, and that plaintiffs became the owners thereof by the terms of the will."

It is also assigned as error that the court did not, in its decree construing the will, determine that it was Alexander's intention by the bequest to plaintiffs to give his individual stock of cattle, and not his after-acquired interest in partnership fattening cattle.

In construing a will, the primary object is to arrive at the testator's intention, and to do this the court will give his language such an interpretation as it is reasonable to presume, from the circumstances in which he was placed, he intended it should receive; and for this purpose parol evidence is admitted in regard to such circumstances, or to put the court in the place of the testator. 1 Redf. on Wills, ch. 10, sec. 37, p. 496.

Whether the testator meant the qualifying words used in the clause of the will in question, "they may have in possession at the time of my death," should apply to and limit the broad significance of the words, "all of my cattle," contained in the same sentence, will not necessarily be determined by strict grammatical rules, if, indeed, the controversy on this subject can be solved in that way, without leaving a doubt whether the testator's meaning, according to the form of expression used, is not at last, to some degree, doubtful for want of making more distinct than has been done, whether he meant to refer "the cattle" to the same clause of lim-

itation to which the "horses" referred to are manifestly and plainly
subject.    Although the terms of the bequest say "*all* of my cattle"
and "*any* horses of mine," still it may well be urged, in making a
free and liberal exploration for the testator's intention, that as the
sentence is not divided into parts expressly indicating whether the
limitation shall apply to each class of property alike, and appears
not to be punctuated, that, according to proper rules of construing
such instruments, decisive effect would not be given to the word
"*all*" as conclusively determining that because it was used in re-
spect to cattle, and the word "*any*" as to the horses, that therefore
the limitation relating to the possession at the time of his death
must include both.    Liberal allowance is made in construing wills
to mere casualties, or ignorance, or awkwardness in the use of
words in their exact sense, and in the structure of sentences, for the
purpose of attaining the paramount object — the real intention of the
testator.    The law will not allow the testator's intention to be de-
feated because he has not clothed his ideas in technical language.
Bell County *v.* Alexander, 22 Tex., 350.

"There is no more clearly established rule of construction, as ap-
plicable to wills, than that words, or clauses of sentences, or even
whole paragraphs, may be transposed to any extent, with a view to
show the intention of the testator.    Pond *v.* Bergh, 10 Paige, 140.
Words and limitations may be transposed, supplied or rejected.
But it must appear, either from the words of the will, or extrinsic
proof, admissible in aid of the words, that the transposition does
really bring out the true intent of the testator, and thus render
what was before obscure, clear."    1 Redf. on Wills (4th ed.), p. 432.

"A technical construction of words and phrases, although *prima
facie* the one which should prevail, will not be carried to the extent
of defeating any obvious general intention of the testator."    1
Redf. on Wills (4th ed.), top p. 436.

The same author says there is no doubt that a particular con-
struction of words, although somewhat variant from their more
natural and obvious import, may be strengthened by reference to
extraneous circumstances.    1 Redf. on Wills (4th ed.), top p. 431.
It is said in Currie *v.* Murphy, 35 Miss., 473, that "such facts are
always admissible in aid of the construction of wills, to the extent of
explaining doubts, or removing uncertainties, when with that aid the
intent is clear."    Citing 37 N. H., 525; 28 Ala., 494; 12 La. An.,
384; 4 Russ., 532, n.; 12 Price, 213; 3 Murphy, 27.

We see no reason to doubt the meaning of the terms employed
in the bequest, when interpreted in connection with the various

provisions of the entire will, and with all the facts and circumstances surrounding the testator tending to show what was his intention; and that he meant to include all the cattle which he then owned when he made the will, or which he might die possessed of, acquired by increase or purchase in the usual course of cattle raising, or acquisition by other means, whereby, in the usual course of business, additions might be made to his original stock of cattle, oxen excepted.

At the time he made the will his stock of cattle was inconsiderable — about thirty-two head, more or less. His estate was large and valuable, worth, perhaps, $27,000. The defendants were neighbors and friends, and but very distantly related to him. He had assisted them in a small way, to relieve apparently the exigencies of their limited circumstances. The provisions he made in their behalf by his will seemed to look especially to aiding them in securing and enjoying a home, more than to making to them a bountiful bequest of great pecuniary value. The legatees consisted of Mrs. B. H. Foote and her eight children, to all of whom the bequests were made jointly; they lived together as a family, residing on the testator's land near his plantation by his permission or invitation to do so. The tract on which they resided consisted, it would seem, of eight hundred acres and was appraised at $1,000. Of this tract the will devised to the Footes aforesaid, jointly, one hundred acres only, and the estate devised was for life only, provided they continued to reside on the land; with the condition of the forfeiture of the interest in it of such of them as removed from it, or was absent from it for the space of two years; with the prohibition against either of them alienating their interest until the youngest of the children attained majority. This devise was succeeded by the clause giving said legatees his cart, cattle (oxen excepted), and any horses of the testator that might be in their possession at the time of his death.

The small amount of land given them out of a large tract, the testator leaving, as shown by the inventory, about three thousand five hundred acres lying in Wharton county, and embracing seven several tracts of land of the value by appraisement of about $15,000, and the limited estate that was thus devised, burdened with the peculiar conditions that were attached to the devise, indicated a disposition to provide a refuge and a home for the family, and a solicitude to keep them all together until the family was raised, rather than to enrich them by a valuable and abundant bequest. Proceeding to the legacy clause involved in this suit, it is noticeable that

the subjects of bequest are comparatively insignificant in value viewed with reference to the only cattle which the testator owned when he made the will, and which cattle it is supposable he had in his mind at that time.

A cart is first specified. Useful to a family needing means wherewith to purchase one, but comparatively insignificant in value. All of the cattle he owned, including his oxen, would have been of the value of but a few hundred dollars; but the testator excepts his oxen, thus leaving only stock cattle to answer to the bequest when it was written, and their value would perhaps not have exceeded $200. As to horses, it does not appear that the testator contemplated anything more in that part of his will than the possible contingency of his loaning horses to his friends, the Footes, some time in the future, and to provide as to such, that they might keep them after his death. The specific devises and legacies in the will to those who seem to be strangers in blood to the testator are small and inconsiderable as compared with those to his cousin Bettie Ashby, and to the children of his cousin Bur Albert Harrison, whom he constituted residuary legatees, and whose share probably exceeded that of all the others combined. To Bettie Ashby he devised the Bear Camp plantation, appraised at $3,000; nearly all the other real estate fell into the residuum of his estate, and his relatives, the Harrison children, took it. Mrs. Foote was the widow of the testator's second cousin; her children would therefore be cousins of the third remove. "It is common to gather some aid, in giving a definite construction to a particular legacy, from those legacies which immediately precede and follow it." See 2 Redf. Wills (4th ed.), top p. 380. "There is no question but errors in the description of the subject-matter of the bequest may be corrected in the same manner and to the same extent that any other mistakes in written instruments may be set right. . . . And in applying the words of the will to the subject-matter, we must look through the list of testator's estate, and select that portion which is best designated. And in this mode, by the aid of extraneous evidence, which is properly receivable, there will, in general, be very little difficulty in arriving at the testator's intention with reasonable certainty." 2 Redf. on Wills, top p. 124.

From the whole context of the will, and from the extraneous circumstances, we think it is fairly deducible that the testator contemplated and meant to give nearly all of his property to the kindred whom he designated in the will, and that he did not mean or intend to give the Footes any great or considerable portion of his estate.

That the leading object in his mind towards them was to make a careful provision for them to the extent of bestowing upon them for life a cheap and inexpensive home, and to give them what he expected would prove to be, at his death, a small stock of cattle, which might vary in value and size according to circumstances, but which in all probability would not be worth more than a few hundred dollars.

Why did the testator except " oxen " from the terms of the bequest? There is nothing in the evidence which can demonstrably and conclusively answer that question perhaps; but, looking to other provisions in the will, and considering the general scope and seeming intent as above indicated towards his relatives on the one hand, and the Footes on the other, it is to be noticed from the inventory, that under the will the Harrison children will take the testator's home place and also his "Fleetwood" plantation. At the time of making his will he recognized in it a contract existing with W. J. Anderson as manager of the " Fleetwood " plantation, and item fifth of the will provides that that contract shall continue in force after his death, and therefore that the plantation business should be kept up and continued the same as during his life.

The contract between the testator and Anderson was made on the 1st day of January, 1876, and by its terms continued until 1st January, 1881. The parties were each to furnish one-half of the necessary *animals*, tools, provisions, forage and money to cultivate the plantation,—Alexander to furnish the plantation, and Anderson to manage and keep it in repair, and both to share equally the net proceeds. It may well be supposed that " oxen " were regarded as animals *necessary* to carry on the plantation, and to furnish them after his death an essential act in carrying out the contract in pursuance of his expressed wish in the fifth item of the will. The contract provides for and only seems to have contemplated, when entered into, the business of cultivating and raising agricultural products — crops,— and of renting parts of the farm for that purpose as well. The raising of cattle or any other available use of them as an element of profit or investment, it would seem, was not in contemplation when the contract or when the will was made, which was the 25th October, 1876. There seems good reason from these conditions to conclude that the testator meant to embrace *all* the cattle he owned, except oxen, at the time of his death when he made the will, and not all the cattle which the Footes might have in their possession at the time of his death; that he had before his mind a distinct plan for keeping up, after his death, the Fleetwood plantation

for the benefit of his partner, Anderson, and for the advantage also, doubtless, of the residuary legatees, the Harrison children; and that he did not intend in his bequest of the cattle to the Footes to allow it in any material degree to militate with his desire to favor above all others those to whom he had given, as residuary legatees, the greater part of his property. The reservation, therefore, of the oxen, and the provision for continuing the partnership contract with Anderson, are circumstances which aid materially other facts in the case in pointing to his intention in respect to the bequest of cattle to the Footes.

If it is made to appear that subsequent to the making of the will the business of the Fleetwood plantation required for carrying it on according to the plans and purposes of the testator and his partner, Anderson, beef cattle for the purpose of fattening them from the grasses, corn and forage produced on the plantation as a means of advantage to their partnership enterprise, it would seem that the same reasons for excluding such beef cattle from the operation of the general designation in the bequest of "all my cattle," as the testator did in express terms indicate, by the positive and expressed exception made by him in respect to oxen. Such beef cattle would not come within the intention and contemplation of the testator. In the first place, it was not until about one year or more after the date of the will that the partners began to vary their ordinary agricultural project (as it was expressed in their written contract), by obtaining beef cattle for fattening and for market; and in the next place, the fifth item, referred to above, shows that the testator probably intended that any such beef cattle owned or possessed by him at his death would constitute a part of the means and capital necessary to continue in operation the contract between him and his partner according to the *status* in which his death would have left their affairs; and that beef cattle then on hand would not have answered fairly and properly, even though they might literally do so, to the designation "all of my cattle at the time of my death."

In the case of Moss *v.* Helsley, 60 Tex., 431, resort was had to the context of the will to determine from a construction of its various provisions whether it was the purpose of the testator to dispose of his wife's interest in community property. We think the principle of construction acted on in that case is properly applied here. And see Speairs *v.* Ligon, 59 Tex., 235; Howze *v.* Howze, 19 Tex., 554.

In addition to the provision made in the body of the will, as quoted, for the continuation after his death of his contract with Anderson, by a codicil thereto, dated February 8, 1877, he provides

that, in the event of his death, W. J. Anderson shall, if he chooses, continue to carry on the Fleetwood plantation under the contract now existing between us as long as he shall see fit to do so and executes his part faithfully.

It appears from the evidence, very satisfactorily, that after the first year's farming under their partnership, the parties devoted their farming operations to the business of raising corn and millet, and realizing from it by buying cattle and hogs to be fed and fattened with those products and to sell the animals thus fattened. Hawes, one of the executors, testified that both the testator and Anderson told him that they had agreed to go into partnership farming and fattening cattle, on the Fleetwood plantation, for the purposes above stated. That Anderson was to sell the beeves and hogs, and after deducting the cost of the beeves and hogs and the expenses of cultivating the farm, and the provisions for the farm and the improvements, was to pay over to Alexander one-half of the net profits. That they were to have annual settlements of accounts, and on the dissolution of the partnership everything in the way of animals on the farm, including horses, mules, sheep, hogs and cattle, and farming implements, was to be divided, after Anderson, as managing partner, had disposed of the fattened beeves and hogs to pay all expenses of the farm and cost and expenses of the stock aforesaid.

That they did farm under that agreement and according to those terms for the year 1877, Anderson buying cattle and hogs to fatten, fattening them, selling them; accounting to Alexander for one-half of losses, and settling with Alexander for moneys received from Alexander wherewith to buy cattle and hogs, and to pay the farm expenses, by giving his note. That they farmed in the same manner in 1878, and that their farming, cattle and hog business had not been settled at the time of Alexander's death — January, 1879. Hawes stated further, that after Alexander's death he, as executor, settled with Anderson after he had sold the fattened cattle and hogs in the same way the parties had before settled. Alexander and Roan conducted the Bear Camp plantation under a similar contract and manner as was done with Anderson. The inventory showed that there were at the Fleetwood plantation at the testator's death " one hundred and thirty-six head of cattle, mostly oxen, bought for fattening," appraised at $2,000; and at the Bear Camp plantation " one hundred and ninety head of cattle, including stock cattle, but steer cattle mostly, put in for fattening," appraised at $2,800. Of these latter the testimony tends to show that about one hundred and eighty head of those cattle belonged to Armstrong, who had con-

tracted with Roan to fatten and sell them on terms following: That Alexander and Roan should pay him $18 per head when the cattle were sold, and they should be entitled to all they could sell them for over that amount. All the cattle referred to were, at the time of Alexander's death, in the possession of Anderson and Roan respectively. Hawes testified that the executors have never had the possession of any cattle, except sixteen head and their increase received from Roan on settlement with him in April, 1879; and eighteen head received from Mrs. Anderson after the death of W. J. Anderson on settlement with her in January, 1883. Anderson had continued to carry on the business until his death, and Mrs. Anderson continued to do so after his death until the end of that year, 1882. Other witnesses confirmed the substance of Hawes' evidence in all its essential features.

From this full view of the terms of the contract, and the nature of the farming and cattle business conducted under it, together with the provision in the will and the codicil for its indefinite continuance after his death, it seems that the testator did not contemplate the acquisition and keeping beef cattle as property to be left as a part·of his estate, or that any beef cattle he might have bought, especially those on the Fleetwood plantation, should be kept in kind. On the contrary, the nature of those transactions and the terms of the contracts, and the relative rights of all parties concerned growing out of them, conduce to show that the testator did not mean that the beef cattle thus bought for fattening were intended to pass under the bequest to the Footes.

Several witnesses testified to the general mode of farming in Wharton county since the war, to the effect that the common habit of farmers was to pursue the same mode that has been indicated was followed by Alexander, in order to render their corn crops available; that, according to their understanding of what would be embraced under the term "cattle," in a gift or sale of "cattle" of the person giving or selling, that growing out of the business habit and custom of farmers of buying fattening beeves for market, they would understand in such a case that the fattening beeves thus bought and on hand would not be meant to be included. All agreed that ordinarily it was understood that the term "cattle" would embrace all classes of animals of the cattle kind, but that in the connection and relation above stated, fattening cattle, bought to be fattened for market, in order to convert and utilize the corn raised, would not be understood as belonging to the stock of cattle proper belonging to the farmer or owner of both.

It is fair to deduce from this understanding of the subject that the testator may have thus apprehended and construed the meaning of the term "cattle," and having employed it in the will did not deem it necessary to make any change by codicil, or to revoke the bequest as it was already worded, in order to give effect to his real intention; and consequently the meaning which farming custom gave to the word becomes an extrinsic circumstance, with others, in this case, to aid in arriving at the testator's meaning and intention.

The legacy was a specific legacy to the Footes, and it can only be operative on such cattle belonging to the testator as were intended to pass under it to them; consequently, as the fattening cattle do not so pass, it is unnecessary to determine any other of the several questions presented in the briefs of counsel under the assignments of error relating to this branch of this appeal.

· The consolidation of the suit first filed in the district court by the plaintiffs against the defendants with that which was by them subsequently filed, was not erroneous. Both of them were entered in the district court upon the same authority, viz., because the judge of the county court was, at the times respectively of their filing, disqualified from trying them. The suit last brought, it is true, prayed for a construction of the will, and it has been often held under our former constitutions and laws, that the district court has original jurisdiction where the plaintiff's claim involves the construction of a clause in the will. Howze v. Howze, 14 Tex., 234, and authorities there cited.

In that case the plaintiff sued the executor for specified property and damages under a clause of the will. Justice Wheeler said: "The right asserted by the plaintiff involved a question of the construction of a clause in the will under which she claimed; and that was sufficient to give the district court original jurisdiction of the case." See, also, Purvis v. Sherrod, 12 Tex., 140. The petition relied on no other grounds than that for the construction of a will, for the exercise of the equity jurisdiction of that court, such as fraud, collusion and combination with or by the executors, the construction and enforcement of trusts and the like grounds, essential ordinarily to give jurisdiction to the district court for affirmative relief, to the exclusion of that of the probate court. The first suit was in effect brought for the same object as was the second. The remedies prayed for had to some extent been abandoned in the former, but only to be revived in the latter. The first, as it had been amended, claimed only the original stock of cattle; the second claimed the remaining cattle, and prayed for a construction of the will. No

good reason is obvious to us why both proceedings should not have been consolidated. R. S., 1450.

The motion to transfer the former suit to the probate court, because there existed no longer any disqualification of the then presiding county judge, ought not, we think, to have been granted; and certainly not, unless both suits were made to share the same result.

Both suits were between the same parties, and involved the construction of the same clause in the will to determine what cattle belonging to the estate were meant to be given. They ought to have been consolidated and tried together in the forum which had jurisdiction to try the one or the other, and not to be separated and the question involved determined piecemeal by different jurisdictions and, possibly, with opposite results.

The two suits being thus properly consolidated, and pending in the district court, it had full jurisdiction to make not only the order which the county court might have made, but to determine finally the construction of the will. Veal v. Fortson, 57 Tex., 488.

The judgment of the court upon the pleadings of both parties confined the issues in the case to the subject alone of the construction of the will, and, after hearing the evidence in the case, its judgment and decree was confined to the determination of the proper construction to be given to the clause of the will under consideration in this suit; adjudging that the "plaintiffs recover all costs herein," and ordering that the judgment rendered be certified for observance to the county court.

This was error. The merits of the whole case were properly before the district court for trial on the merits as to every issuable matter material to the parties for determination, the same as if it had been tried in the county court.

It is provided in section 16, article 5, of the constitution, as follows: "Any case pending in the county court, which the county judge may be disqualified to try, shall be transferred to the district court of the same county; and where there exists any cause disqualifying the county judge for the trial of a cause of which the county court has jurisdiction, the district court of such county shall have original jurisdiction of such cause." See, also, art. 1121, R. S., to the same effect.

The district court having original jurisdiction of the two consolidated suits (both of which it would seem were filed during the period of the disqualification of the judge of the county court), and there being no provision of the law requiring or permitting the transfer of said causes to the county court in case the disqualifica-

tion of the county judge should be removed, or cease, during the pendency of the suits, the district court would be as fully clothed with jurisdictional authority to determine the causes as it would be in any other case in which original jurisdiction was conferred by law. We are of opinion, therefore, that in so far as the rulings of the court upon the defendants' demurrers and special exceptions to the plaintiffs' petition, and upon the plaintiffs' demurrers to the defendants' answers, were sustained because said pleadings could not properly present any other issue for hearing than that of the construction of the will, that the court erred. The merits of the whole case were before the court for its decision, and the pleadings of the parties ought to have been treated accordingly.

It follows from this view that the court should have found as conclusions of fact all such material facts as were properly issuable, and appropriate to be ascertained as the basis of conclusions of law which would settle all the rights of the parties involved in the case.

The conclusions of fact as found by the court below are too limited to afford a basis for this court to proceed to render such judgment as ought to have been rendered below. The facts on which a proper judgment can be based must be ascertained on another trial, and we apprehend that the pleadings in the case, taken in connection with the construction given in this opinion to the clause of the will which is the subject of controversy, will sufficiently indicate the course then to be pursued, without further comment.

We conclude that the judgment ought to be reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

[Report adopted March 27, 1885.]