FIRST NAT. BANK OF BEAUMONT et al.
v. HOWARD et al.
No. 4593.

Court of Civil Appeals of Texas. Beaumont.
Sept. 15, 1949.

Rehearing Denied Oct. 19, 1949.

Strong, Moore & Nelson, Beaumont, Sam Lipscomb, Beaumont, for appellants.

W. T. McNeill, Beaumont, for appellees.

WALKER, Justice.

On January 30, 1945, E. S. Nowery made his last will and testament, in which the appellant, The First National Bank of Beaumont, was named Independent Executor, without bond, and was also made Trustee of Mr. Nowery's estate upon the close of administration proceedings. Mr. Nowery died on October 29, 1946, and on November 19, 1946, the will was probated and the Bank was appointed Executor as aforesaid and on the same day qualified as Executor. Subsequently, the estate was administered, and on May 14, 1947, the Bank as Executor transferred and delivered Mr. Nowery's estate to itself as Trustee, retaining, however, a small portion with which to discharge further tax assessments should any be made. The retention of this property is not in question here. The Bank has since acted, and is now acting, as Trustee under Mr. Nowery's will. After the Bank began to act as Trustee, a dispute arose between the Bank and some of the beneficiaries of the trust concerning the meaning of Subsection 2 of Section III of the Fifth article of said will, and this suit was brought by said beneficiaries as a result.

The beneficiaries of the trust were Mr. Nowery's two daughters and the children of said daughters. At the time the will was made, and at the time Mr. Nowery died, each daughter was married and each daughter had a son, and considering the ages of Mr. Nowery's daughters it is not probable that either will have more children. The provisions concerning the trust are set out in the Fifth article of the will; in Subsection 1 of Section III of the Fifth article one-half of the net income from the trust estate was given to each of the two daughters during their respective lives, with contingent remainders therein to their respective children and with subsequent contingent cross-remainders therein to the other daughter and her children. The corpus of the estate was disposed of in Section IV of the Fifth article; and in Subsection 3 of Section IV the corpus of the estate was given to Mr. Nowery's grandchildren upon the termination of the trust, which under Subsections 1 and 2 of Section IV occurred either upon the death of Mr. Nowery's daughters or the arrival of the youngest grandchild at the age of 24 years, whichever was the latest event, or upon exhaustion of the corpus of the estate through authorized expenditures. The controversial Subsection 2 of Section III is quoted hereinafter; it gave the Bank as Trustee, the right, in case the net income from the estate was "insufficient", to expend the corpus of the estate to provide the beneficiaries with proper maintenance and support (as well as necessary and reasonable medical care and proper education advantages); and the daughters argued to the Bank that Subsection 2 gave them a right to full and complete maintenance and support out of the corpus of the trust if and whenever the net income from the trust estate, considered alone and without regard to any other income or property available to them, was insufficient for that purpose. The Bank has taken the opposite position and now insists that under Subsection 2 corpus of the trust estate is not to be expended for the objects mentioned therein until all income available to the beneficiaries shall have been taken into consideration and a further and supplementary expenditure from the corpus of the estate is actually needed if the beneficiaries are

to have the proper maintenance and support (and the medical care and educational advantages) referred to in Subsection 2. According to the petition as amended, the judgment, and the trial court's findings of fact, the issue between the parties was broader and included the question, whether capital assets as well as income ought to be considered in determining whether an expenditure from the corpus of the estate was necessary.

To resolve the issue made between them and the Bank, Mr. Nowery's daughters, joined by their husbands, brought this suit. They prayed a construction of the will in accordance with their views, and an award to them out of the corpus of the estate sufficient for their proper support and maintenance. According to the trial court's 7th finding of fact, this suit was not an adversary proceeding, but was suggested by the Bank as the proper means of determining the questions at issue.

The defendants to this suit were the Bank, in its capacity as Executor and Trustee, and testator's two grandsons, for whom, they being minors, the trial court appointed a guardian ad litem.

The Bank's original answer was a general denial, but this pleading was amended, and as amended contained the following allegations: "This defendant further admits * * * that said will and particularly paragraph 2 of Section III of article fifth thereof, is a proper subject for judicial interpretation as to the meaning and intent of the testator therein; that this defendant believes that the sole and only point for interpretation in this suit is a determination of the question as to whether or not in paragraph 2 of Section III, article fifth, it was the intent of the Testator that the Trustee be authorized to take into consideration income of the beneficiaries from sources other than the Trust Estate in determining whether or not any part of the corpus of the Estate should be distributed for their maintenance and support; that this defendant believed it the intent of Testator that income from sources other than the Trust Estate should be considered, and therefore, has refused the request of the plaintiffs, who are the present bene-

ficiaries under said trust, for the reason that they have sufficient income for maintenance and support from sources other than the Trust Estate; that defendant construes its duty to be one of following strictly and to the best of its knowledge and ability the intent of Testator as expressed in said will, or as some may be construed by a court of competent jurisdiction." As noted above, other parts of the record show an issue between the parties broader than the question as to the propriety of considering income from sources other than the trust estate.

The Testator's grandsons, by their guardian ad litem, filed an answer consisting of a general denial. Subsequently, this guardian resigned, a successor guardian ad litem was appointed, and the answer was amended. In their amended pleading, the grandsons, in effect, adopted the construction of the will which is expressed in the quotation just made from the Bank's amended answer. ..

The cause was tried before the court sitting without a jury, and the judgment of the trial court is based upon proof made at two hearings, one on August 24, 1948, and another on October 5, 1948. We note that plaintiffs filed a trial amendment, and that all defendants filed their amended answers, on the latter date. The trial court rendered judgment on October 15, 1948, adopting plaintiffs' construction of the controversial Subsection 2 in the following language, to wit: "—it was the intention of Testator that the Trustee not take into consideration income to or property of the beneficiaries or their husbands from sources other than the trust estate—". The trial court also rendered judgment in behalf of plaintiffs for the sum of $300 a month for the period beginning on March 1, 1948, (when plaintiffs first made demand on the Bank for an expenditure out of corpus) and ending on October 15, 1948, the date said judgment was rendered, but decreed that further payments should be determined by the Trustee, under and in accordance with the discretion given it in the controversial Subsection 2. The trial court also ordered the payment of certain sums to the at-

torneys of the plaintiffs and to the guardians ad litem of the minor defendants. From this judgment the defendants, to wit, the Bank and the Testator's grandsons, by their guardian ad litem, have appealed.

The Bank and the guardian ad litem have filed separate briefs, each containing two points of error for reversal. In substance, Point 1 in each brief attacks the trial court's construction of the controversial Subsection 2, and Point 2 attacks the award of money to the Testator's daughters, to be taken out of the corpus of the trust estate.

The trial court has filed findings of fact and conclusions of law; but there is a statement of facts on file, and since no material dispute exists in the proof, we have thought it better to state the relevant proof, supplementing it with some of the findings, as follows:

(1) Testator was a widower at the time he made his will. His wife died some 8 or 10 years prior to his own death, and he did not remarry.

Four children were born to him and his wife, but two died in infancy, leaving the two daughters who are the plaintiffs here. These women are Hazel Irene Howard, wife of W. Elray Howard, and Nina Mae Massey, wife of Erwin Massey.

Mrs. Howard was about 45 years old on the date of Testator's will (January 30, 1945), and thus was about 47 years old when Testator died. She had been married to plaintiff W. Elray Howard about 24 years on the date of Testator's will.

When Testator died, Mr. and Mrs. Howard had one child, a son named Elray Howard, Jr., who is one of the defendants. This boy was about 13 years old at the time Testator made his will. The Howards had one other son, who died while a member of the armed services of the U. S. The proof does not show the date of his death.

Mrs. Massey had been married to plaintiff Erwin Massey for a number of years before the date of Testator's will. The Masseys had one child, a son named Robert Lee Massey, who is about 6 months younger than his cousin Elray Howard, Jr., and who was about 12 or 13 years old on the date of said will.

It must be inferred from the record, showing, as it does that each member of the Howard and Massey families makes such contribution to the welfare of his family as may be required and be within his capacity, that each of said families is a harmonious and united group.

(2) At the time of his death, Testator was a retired employee of the Sun Oil Company. He had been in the employ of that company more than 30 years, and had ended his career in a position of some importance, namely, that of Field Superintendent of the Production Department in the Beaumont Area.

(3) Testator provided well for his daughters before their marriage, and gave them a college education.

It is apparent that he loved his daughters and their children, and that he was on the best of terms with his sons-in-law. Mr. Howard testified:

"Q. He was always very liberal with the girls, with the daughters? A. Not only with the daughters was he liberal.

"Q. But with you also and the other son-in-law? A. That's right, anybody in his family."

He was very generous toward his daughters and made substantial contributions toward their support. These contributions evidently extended throughout the marital life of his daughters, but it was proved that during the last two or three years of his life he had given each of his daughters from $3,000 to $4,000 a year. He gave his daughters automobiles. Mrs. Howard said that he provided both her and her sister with their clothing. She said that her father was very kind and generous to her and to her sister, and that he denied them nothing, that he would give them things for which they expressed a wish but for which they had not asked.

He made no distinction between his daughters and meticulously saw to it that one received from him no more than did the other. Mr. Howard testified: "He was very specific always in saying he wanted

them to share equally. When he gave to one he would turn around and ask the other, 'What can I do for you, now.' It has always been the same amount of money."

Testator's gifts to Mrs. Massey were necessary for her proper support and maintenance, as the circumstances related hereinafter in Paragraph 3 show; but the gifts to Mrs. Howard were not necessary for her support.

The proof also shows that Testator made occasional gifts to his grandsons, and Mrs. Howard said: "They would go to him and want to go somewhere, and he would give them some money."

There is no evidence of any improvidence on the part of any of Testator's beneficiaries, or of any conduct or characteristic which Testator would wish to restrain or to guard against.

(3) The trial court has found, that Testator's beneficiaries "moved in the better, more prosperous class of society."

Mr. Howard has always earned an income on which he could have properly supported his family. At the time Testator made his will, the Howards and Testator resided in different towns; but later the Howards returned to Beaumont, where Testator resided at the time of his death, and established there a business of their own. The proof does not show whether this occurred before or after Testator died. The Howards' business was the operation of a grocery store, referred to in the proof as a "drive in grocery". The business was actually owned by a corporation which Mr. and Mrs. Howard owned; each held stock in this corporation. The business earned an average net monthly income of from $600 to $700. Its establishment had been attended with the creation of some indebtedness; there was a $16,000 mortgage on the property used in the business. The concern also maintained a small open account (about $1,900) at one of the local banks. The proof does not show how the earnings of this business came into the hands of Mr. and Mrs. Howard, or, indeed, whether any of it was paid to Mrs. Howard, nor is it entirely clear to us that all of this $600 or $700 a month was available to the Howards for expenditure upon the support and maintenance of them and their son. However we have assumed that it was, since it is referred to in the proof as net income, and this seems to have been the trial court's conclusion since the trial court found that the Howards "operate a drive-in grocery store, in which both work and make an income of about—($600.00)—a month."

Mrs. Howard worked in this grocery, devoting about one-fourth of her time to that employment. She thus filled the place of a part time employee, but her services were evidently needed and her work represents an effort on the part of the Howards to reduce the operating expenses of the business.

Mrs. Howard employed a maid to care for her home.

No other source of income and no other property owned by the Howards is referred to in the proof. The trial court found that Mr. and Mrs. Howard "have property worth about—($35,000.00)."

Mr. and Mrs. Massey have not been as prosperous as the Howards. At the time Testator made his will, and for some 6 or 7 years prior thereto, they had lived in Colorado. Mr. Massey had purchased some sort of rural property (Mrs. Howard referred to it as a "ranch"), apparently before Testator made his will and he seems to have operated this property. However, he had not been well for several years prior to Testator's death, and at the time of the August 24th hearing was suffering from high blood pressure and was not able to work. The property just mentioned producted little income above taxes. It was in proof that the Masseys had had only a small income since removing to Colorado (which, as indicated, occurred several years before the date of Testator's will), that they had paid no income tax during that time, that most of the Massey's income during that time, prior to Testator's death, had consisted of Testator's gifts, that Mrs. Massey had learned the trade of making hats and was working in a millinery store, that her son Robert Lee Massey (who was attending high school) also worked after he left his school in the afternoon, and that it was necessary for them to do so and thus supplement the other small family income,

that the Masseys' net Federal income for 1947 (the year preceding the hearing of August 24th) was $298.03, and of this the sum of $273.21 was income from the trust estate which had been paid to Mrs. Massey by the Bank.

The proof shows that the property owned by the Masseys is of some value. According to Mrs. Massey, their home was worth about $15,000 and they owned other items of property (not identified) worth about $10,000.

The proof does not show how the title to the Massey property is vested, and we have accordingly treated it as if it were community property of Mr. and Mrs. Massey.

. In addition to the income and assets just mentioned, each of Testator's daughters also had a monthly income of $96.10 for the period of 10 years after Testator's death (on October 29, 1946). These payments were the proceeds of insurance policies, procured by Testator either from or by virtue of his association with his employer "long" prior to the date of Testator's will.

We think it a reasonable inference from the proof as a whole that Testator's daughters were not required to, and that they did not earn their livelihood during his lifetime. Testator's munificence while alive made it unnecessary for either of them to earn her living. It seems clear that Testator desired them to lead the life of the married woman who devotes herself to her family and makes this her career. It also. seems clear that Testator's daughters now work and contribute toward their own support and maintenance only because that is necessary.

The trial court's conclusion that each of Testator's daughters required $300 a month to properly maintain and support her is supported by the evidence.

(4) At the time of the hearing on October 5, 1948, the son of Mr. and Mrs. Howard, namely, Elray Howard, Jr., was attending the University of Texas. He had previously attended Lamar College one year. The expense of his care and of his education had been paid by his parents, and they intended to complete his college education.

The son of Mr. and Mrs. Massey, namely, Robert Lee Massey, had not yet completed his high school studies, but he was expected to do so and to be ready to enter college in January, 1949. His parents wanted to send him to college, and he desired a college education, but the Masseys did not have the means wherewith to give him such an education.

(5) Testator left a substantial estate, and the gifts made by him to his daughters during his life time indicate that he had a substantial income.

The Bank's inventory of Testator's estate shows that the estate had a net value of $136,182.54. The gross value shown was $141,696.25, which was made up of the following items: (a) Real Estate valued at $14,501; (b) Bonds issued by the U. S. Government, valued at $12,656; (c) 1394 shares of stock in the Sun Oil Company, valued at $93,871.50; (d) 46 shares of stock in Standard Brass & Manufacturing Company, valued at $2,300; (e) 56 shares of stock in Security State Bank & Trust Company, valued at $9,800; (f) money on deposit, amounting to $5,833.70; (g) proceeds of a life insurance policy payable to his estate, amounting to $2,000; (h) several other items of small value.

From this inventory it thus appears that 66.2 per cent of the Testator's gross estate was invested in Sun Oil Company stock. A table in the statement of facts shows that Testator began to acquire this stock in 1930; and that during that year and each subsequent year (except 1931) he acquired a small number of shares until, when he died, he owned the number of shares mentioned. During this period he was an active and then a retired employee of the Sun Oil Company, and during all of this period his employer had in effect a stock purchase plan for the benefit of its employees under which the employee was allowed to subscribe for a certain amount of stock, and toward the purchase price of this stock the Company then made a certain contribution. Testator certainly participated in this plan, but the amount of stock he thereby acquired is not shown.

The proof shows that for many years Sun Oil Company has followed the prac-

tice of paying the annual dividends in cash and in stock. The part of the dividend paid in cash was small, and amounted to $1 a share except in one year when it amounted to 75 cents a share. This practice undoubtedly existed during Testator's lifetime and testator was necessarily familiar with it.

The bulk of the dividend was paid in stock, and it has ranged in amount from 3% to 10% each year. Since Testator's death the Sun Oil Company has delivered to the Bank the following stock dividends: (a) 278.8 shares on April 23, 1947, being one share of stock for each five shares of stock owned by the estate (which thus seems to have owned 1,394 shares the number listed in the inventory); (b) 130 shares on December 30, 1947, being 1 share for each 10 shares owned by the estate (which thus seems to have owned 1,300 shares, showing a previous disposition of 372.8 shares). As of August 24, 1948, this stock was worth $68.25 per share. If at that time the Bank had not sold any of this stock, the estate then owned 1,430 shares worth $97,595.50. This would represent an increase of $3,696 in the value of the Sun stock held by the estate over and above the value listed in the Executor's inventory. However, the parties have filed the following agreed item of proof, which does not square with this figure or with the inference we have drawn as to the number of shares upon which these two stock dividends were calculated, said item of proof being: "— that such stock dividends have added Twenty-seven Thousand Eight Hundred Ninety-eight and 60/100 ($27,898.60) Dollars in value to the Trust estate, as of August 24, 1948, held by the Trustee. * * * and that for several years previous to 1947, stock dividends valued at about—($10,000.-00)—were paid thereon."

It is at least clear that the Bank has elected to keep the bulk of the estate invested in the stock of the Sun Oil Company.

The proof does not show what has been done with the balance of the inventoried properties, but tax assessments evidently consumed a portion thereof. The real property listed on the inventory has been sold.

The net income earned by the trust estate, payable to the beneficiaries of the trust, has been exceedingly small. On the hearing of August 24, 1948, Mrs. Howard testified that she and her sister had each received so far about $700, from which it appears that the total net income during a period of almost two years since Testator died had amounted to only about $1,400. We have mentioned Mrs. Massey's statement that in 1947, the Bank had paid her only $273.21. The Bank estimated, at the time of the hearing of August 24, 1948, that the total net income for that year would be $1,428. Of this Testator's daughters would each receive $714. This is only a small part of Testator's former gifts, which amounted to $3,000 or $4,000 a year during the last two or three years of his life; but when it is added to the payments made under the insurance policies ($1,153.-60 a year) the total gift is substantial, namely, $1,867.20, or $155.60 a month.

(6) The trial court made the following findings concerning the Bank's conduct respecting the request of Testator's daughters for an allowance to them out of the corpus of the estate: "I further find * * * that * * * on or about March 1, 1948, (the attorney employed by the daughters) did call upon the Trust Officer of the (Bank) and discussed with him the question of further payment from the trust estate for the support and maintenance of these beneficiaries, the beneficiaries believing that under said will they should have more allowance, as the net income from the Trust Estate was inadequate for their support and maintenance. The trust officer advised the attorney for the beneficiaries at said time that the Trustee could not safely pay out any money for such purpose over and above the net income from said estate without an order from a court of competent jurisdiction; that the trustee stood ready and willing to comply with the judgment of the court in the matter, but the will in the respect involved, to wit, paragraph 2, Section III, article "Fifth" of the will it considered ambiguous, and that there was doubt on the part of the Trustee that under the said paragraph of said will that it had authority to make any payment to the bene-

ficiaries out of the corpus or principal of the said estate without taking into consideration other property or income the beneficiaries or their husbands may have, and suggested that the matter should be passed upon by a court of competent jurisdiction."
* * *

"That at the conclusion of the hearing on August 24, 1948, the court announced as his conclusion that the Trustee, in determining whether or not the plaintiff beneficiaries were entitled to payments out of the corpus of the estate, should do so without regard to any other income or property which they or their husbands should own. The court then adjourned the hearing so that further details with respect to any allowance or allowances to the said beneficiaries could be made and set."

"I further find that on the 5th day of October, 1948, all the parties to this cause again appeared in Court, and some additional testimony having been heard, all of which was cumulative of testimony heretofore introduced on August 24, 1948, and the Court then reaffirmed his conclusion theretofore made on August 24, 1948."

These findings do not show an exercise of the discretion vested in the Bank under the controversial Subsection 2; they show, instead, a refusal to exercise that discretion because of a dispute concerning the factors upon which an exercise of that discretion should be founded.

However, the record does show that the Bank finally purported to exercise its discretion when it filed its amended answer on October 5, 1948, the date of the second hearing in the trial court. This pleading, which has been quoted above, expresses in the portions thereof which we have underlined, a refusal to expend any of the corpus of the trust estate and bases this refusal solely upon the information then before the Bank concerning the income available to the plaintiffs for their maintenance and support. No objection was made to the form, character, or sufficiency of this information, and there was no request for additional information.

There is proof that Mrs. Howard, at least, did not intend to use for her own support and maintenance the award out of the trust corpus for which she prayed. She planned, instead, to use it for the education of her son; and it is evident from her testimony and from her brief in this court that she construed the controversial Subsection 2 as authorizing such a course, that is, that in determining the sum needed to properly maintain and support her (properly is used in Subsection 2) the needs of her son, Elray Howard, Jr., ought also to be considered. The trial court seems to have adopted this construction of Subsection 2; we note the following in that court's 3rd Conclusion of Law: "That this (referring to the money award to Plaintiffs) will aid the daughters financially now, and in effect, will be aiding the minor beneficiaries in obtaining their education, which, if they are to receive, should be presently available to them."

(7) The provisions of Testator's will which create and provide for the administration of the trust are contained in the Fifth article of the will, and such parts of the Fifth article as we have thought necessary to be mentioned are quoted below. The four preceding articles deal with the administration of the estate in probate.

In the forepart of the Fifth article, Testator devised and bequeathed his entire estate to the Bank in trust "for the use and benefit of the beneficiaries hereinafter named", upon the terms thereinafter stated.

Section I of the Fifth article enumerates various powers given the trustee for the administration and investment of the estate. These powers are very broad and some of the provisions of this section have been referred to in the briefs, but we think that none of the provisions of Section I are relevant to the issues made on this appeal.

Section III, entitled "Disposition of Income from Trust Estate before termination", provides as follows (we omit contingent remainders which have lapsed):

"1. It is my will and desire, and I so direct, that said Trustee shall during the life of this trust, hold in trust and manage and control, with the powers herein conferred upon it, the entire Trust Estate, and after paying therefrom all reasonable and necessary expenses and charges incident to said trust and said Trust Estate, including

the compensation herein provided to be paid to the Trustee for its services as such, the Trustee shall (from and after the time the Trust Estate shall be delivered by the Executor to the Trustee as hereinabove provided) pay over and distribute the entire net income from said Trust Estate in convenient installments as follows:

"(a) To my daughter, Hazel Nowery Howard, wife of W. Elray Howard, an undivided one-half (½) of said net income.

" * * * should the said Hazel Nowery Howard survive me but become deceased prior to the termination of this trust and leave issue surviving, then the share or portion of said net income from the Trust Estate which would have been paid to the said Hazel Nowery Howard had she lived shall be paid to such issue of said Hazel Nowery Howard per stirpes.

"Should the said Hazel Nowery Howard * * * survive me but become deceased prior to the termination of this trust and leave no issue surviving, or should she survive me and leave issue which does not survive the termination of this trust, then that portion of the net income from the Trust Estate which would have been paid the said Hazel Nowery Howard, or to her issue, shall be paid to my other daughter, Nina May Massey, wife of E. H. Massey, or, if she likewise be deceased, then to her issue per stirpes.

"(b) To my daughter, Nina May Massey, wife of E. H. Massey, an undivided one-half (½) of said net income.

* * * or should the said Nina May Massey survive me but become deceased prior to the termination of this trust and leave issue surviving, then the share or portion of said net income from the Trust Estate which would have been paid to the said Nina May Massey had she lived shall be paid to such issue of said Nina May Massey per stirpes.

"Should the said Nina May Massey survive me but become deceased prior to the termination of this trust and leave no issue surviving, or should she survive me and leave issue which does not survive the termination of this trust, then that portion of the net income from the Trust Estate which would have been paid to the said Nina May Massey, or to her issue, shall be paid to my other daughter, Hazel Nowery Howard, or, if she likewise be deceased, then to her issue per stirpes.

"2. In the event the net income from this Trust Estate shall be insufficient in the discretion and judgment of the Trustee to properly maintain and support those persons who, under the preceding paragraph are entitled to portions of said net income and to enable said persons to procure necessary and reasonable medical care, aid and assistance, and to give said persons proper educational advantages, then, and in that event, the Trustee shall be authorized to pay for such purposes such additional sums out of the corpus of the said Trust Estate as may in its sole and uncontrolled discretion be necessary or advisable. In determining whether such additional sums shall be paid out for said persons, the decision of the Trustee shall be final and conclusive.

"3. In the event payments out of principal are made to any of the beneficiaries under the above provision, such payments shall be charged against the interest of the persons to whom payments are made."

Termination of the trust is provided for in Section IV of the Fifth article, as follows:

"1. The Trust hereby created shall cease and terminate upon the death of the last surviving of my two daughters, or upon the attainment of the age of twenty-four (24) years by the youngest of my grandchildren who lives to attain the age of twenty-four (24) years, which ever event shall occur last; Provided, however, that if both of my said grandchildren become deceased prior to attaining the age of twenty-four (24) years, and both of my said daughters are at that time deceased, then the trust shall terminate upon the death of the last surviving of my said grandchildren.

"2. In the event the Trust Estate should become completely exhausted by reason of payments therefrom as herein authorized, the Trust shall cease and terminate upon said Trust Estate becoming so exhausted.

"3. Upon the termination of this Trust, as above provided, the entire Trust Estate,

as it then exists, shall be delivered in cash or in kind, or partly in cash and partly in kind, as follows:

"(a) To the issue of my daughter, Hazel Nowery Howard, an undivided one-half (½) of said estate, same to be distributed to such issue per stirpes.

"Should my daughter, Hazel Nowery Howard, leave no issue who shall survive the termination of said Trust, then the portion of said Trust Estate which would have been transferred and distributed to the issue of said Hazel Nowery Howard shall be transferred and distributed to the issue of my daughter, Nina May Massey; or, if the said Nina May Massey likewise became deceased without issue, then said one-half (½) interest shall pass to and vest in my heirs at law according to the then laws of descent and distribution of the State of Texas.

"(b) To the issue of my daughter, Nina May Massey, an undivided one-half (½) of said estate, same to be distributed to such issue per stirpes.

"Should my daughter, Nina May Massey, leave no issue who shall survive the termination of said Trust, then the portion of said Trust Estate which would have been transferred and distributed to the issue of said Nina May Massey shall be transferred and distributed to the issue of my daughter, Hazel Nowery Howard; or, if the said Hazel Nowery Howard likewise became deceased without issue, then said one-half (½) interest shall pass to and vest in my heirs at law according to the then laws of descent and distribution of the State of Texas."

Section VI of the Fifth article makes the trust a "spendthrift trust", providing as follows:

"Neither the principal nor the income of this Trust Estate shall be liable for the debts of said beneficiaries, nor shall the same be subject to seizure by any claimant of said beneficiaries under any writ or proceedings at law or in equity, and no beneficiary hereunder shall have any power to sell, assign, transfer, encumber, or in any other manner to anticipate or dispose of his, or her, interest in any portion of said Trust Estate, or the income thereof."

## Conclusions of Law.

(A) The matter to be determined is the meaning of the expressions used by the testator in the controversial Subsection 2, and the standard of interpretation and the sources from which the tenor of that standard are to be determined have been stated in Hawes & Duncan v. Foote, 64 Tex. 22 and in McCreary v. Robinson, 94 Tex. 221, 59 S.W. 536.

(B) The interpretation of Subsection 2:

We are not in full agreement with either party as to the interpretation of Subsection 2, and we have seen no decision in point on the facts. We shall therefore indicate only in the briefest way some of the arguments of the parties.

The controversial Subsection 2 (of Section III) reads: "In the event the net income from this Trust Estate shall be insufficient in the discretion and judgment of the Trustee to properly maintain and support those persons who, under the preceding paragraph are entitled to portions of said net income and to enable said persons to procure necessary and reasonable medical care, aid and assistance, and to give said persons proper educational advantages, then, and in that event, said Trustee shall be authorized to pay for such purposes such additional sums out of the corpus of the said Trust Estate as may in its sole and uncontrolled discretion be necessary or advisable. In determining whether such additional sums shall be paid out for said persons, the decision of the Trustee shall be final and conclusive."

Plaintiffs, Testator's daughters, argue that this perfects a gift to them of full and complete support and maintenance, out of Testator's estate, and that the right to use corpus of the trust estate for that purpose depends solely upon the insufficiency of a single specified fund, namely, the net income from the trust estate, to properly support and maintain them. They say that income and assets other than the net income from the trust estate are not to be considered by the Bank in exercising the discretion vested in it under Subsection 2 because the rights are not contingent upon a failure of such other income. They base this argument, in part, upon a literal

application of the opening words of Subsection 2, to wit: "In the event the net income from this Trust Estate shall be insufficient * * *".

The Bank argues on the other hand that Subsection 2 makes a gift to the Testator's beneficiaries which was not to be used until, and then only was to be used so long as it was needed to provide the beneficiaries with the support and maintenance (and, as a result, the medical care, and the educational advantages) referred to in Subsection 2. The Bank says, accordingly, that income available to the beneficiaries other than the net income from the trust estate must be taken into account in determining whether an expenditure from the corpus of the trust estate is needed.

■ We sustain this conclusion of the Bank upon the following grounds:

Subsection 2 does not name or individually identify the beneficiaries for whom corpus of the trust estate may be expended. Instead, these beneficiaries are referred to as a group or class, and are thus identified, by the words "those persons who, under the preceding paragraph, are entitled to portions of (the net income from the trust estate)".

The "preceding paragraph" is Subsection 1 (of Section III), and in it Testator gives the net income from the trust estate to his daughters, one-half to each, with contingent remainders in this income to the children of the respective daughters and with subsequent contingent cross-remainders in favor of the other daughter and her children. Do the words "those persons who * * * are entitled to portions" of the net income refer only to the beneficiaries whose right to receive this income has vested? That is, does the right of a beneficiary to an expenditure of corpus under Subsection 2 depend in the first instance upon that beneficiary's right to net income having vested? Or does "entitled" refer to and include the contingent remaindermen as well?

■ We think that "entitled" was used in the broader sense, and that it refers to all of the beneficiaries of the net income, those whose right to the income is vested and those whose right is still contingent, because of the nature of the purposes for which corpus of the trust estate may be expended under Subsection 2. Among these purposes was proper educational advantages. This vouchsafes an education to some one and this gift was certainly intended for testator's surviving grandchildren, who were some 12 or 13 years old when the will was made; testator's daughters, who were the mothers of these children, had already received an education, having attended high school and college. This gift of an education certainly was intended to include study at college; we say this because of the size of Testator's estate and because he gave his own daughter a college education. Well, the need of testator's grandchildren for an education, collegiate or otherwise, was not contingent upon the vesting of the grandchildren's right to the net income. The grandchildren would need the education as they approached maturity, and this might occur before the grandchildren's right to the net income had vested. Their right to this income depended upon the lives of their mothers, and if these women lived a normal life span, as they probably would, the grandchildren would be mature men and past the ordinary age at which formal instruction is now given before their right to the income vested. Indeed, they might be beyond the age of twenty-four years before they became entitled to receive the net income, by reason whereof, under Subsection 1 of Section IV, their mothers having died the trust would terminate at the same time that their right to the net income vested in them. These comments show that if the grandchildren were required to wait until the vesting of their right to net income before an expenditure of trust corpus would be made under Subsection 2 to provide them with the proper educational advantages vouchsafed them in Subsection 2, their right to such an expenditure probably would be of no value to them; and such a result could not have been intended by the Testator. All of the facts and probabilities were known to the Testator when he made his will, and he must have intended that his grandchildren receive their education at the usual and

proper time; and thus must have expected them to attend high school at the usual age and to attend college upon the completion of their high school studies. This result can only be accomplished by interpreting Subsection 2 as authorizing an expenditure of trust corpus when it was actually needed to provide the education which Testator wanted his grandchildren to have, and since this construction is well within the possible meanings of the word "entitled" to which we have referred, we adopt it because, as stated, we think that it effectuates the Testator's intention.

These conclusions are fortified by a consideration of the other purposes for which Subsection 2 authorizes an expenditure of corpus. For both other purposes, namely, proper maintenance and support and necessary and reasonable medical care, aid and assistance, involve absolute necessities. Lacking either the maintenance and support or the medical care vouchsafed Testator's beneficiaries by Subsection 2 (and here we refer to all of said beneficiaries), these people might not survive to enjoy the Testator's other gifts, that is, the net income from the trust and the corpus of the estate.

We must, therefore, construe Subsection 2 as making a gift to all of the beneficiaries as a class, those whose interest in the income has vested and those whose interest is contingent still; and we hold that Subsection 2 must have been intended to provide means for expenditures which failure of other means (as hereinafter identified) had made necessary if the beneficiaries were to have the various things specified in Subsection 2. We hold further, as a consequence, that the gift made in Subsection 2 is wholly independent of Testator's other gifts to his beneficiaries, that it was made to each beneficiary as required by each, and that the relief afforded thereby was intended to be made available to the particular beneficiary as speedily as possible when the need requiring this relief had come into existence.

The following considerations support this construction of Subsection 2:

First:—A beneficiary's right under Subsection 2 to an expenditure of corpus is made dependent upon an exercise of discretion by the Bank as Trustee, not only as to the amount to be expended but also as to the insufficiency of the trust income to provide therefor, that is, as to the need for the expenditure. The Testator's other gifts are absolute, not discretionary. Thus in Subsection 1 of Section III, the net income was given absolutely to the Testator's daughters, with the remainders hereinbefore specified, and in Subsection 3 of Section IV the corpus of the trust estate was given absolutely to the grandchildren.

Further, in the controversial Subsection 2, the purpose for which the corpus of the trust could be expended were distinctly specified. These purposes were few and were limited to necessities. But the gifts of net income and corpus just mentioned are not limited to any purpose. The tenant may expend his income or property as he or she desires.

Second:—All of the persons to whom were given interests in the trust were also provided for in the controversial Subsection 2. For instance, each beneficiary was given exactly the same right to an expenditure of corpus for his or her support and maintenance or for his or her medical care. Testator did not even go to the trouble of identifying the individuals entitled, but simply referred to them under the class name "persons". The failure to limit Subsection 2 to less than all of the beneficiaries is significant because among the beneficiaries of the trust are those whose interest is otherwise limited to the net income and other beneficiaries who may be expected to come into possession of the corpus of the estate upon the termination of the trust. The fact that no preference has been made in favor of either group shows that the corpus was not to be saved to those to whom it was given and that it was not to be denied to those to whom were only given interests in the income. Such a provision seems consistent with use of the corpus only as needed.

Third:—Subsection 3 of Section III provides that "in the event payments out of principal are made to any of the beneficiaries under the above provision (the controversial Subsection 2) such payments

shall be charged against the interest of the persons to whom payments are made." This provision obviously contemplates a payment to one beneficiary which is not, at the same time, to be duplicated and made to another beneficiary, and thus accords with a construction of the authority to pay as one intended to be used only when needed. The interest of each of plaintiffs, Testator's daughters, is the right to receive one-half of the net income from the trust estate; and since the children of each daughter have contingent remainders in that one-half and also are to receive one-half of the corpus of the estate upon the termination of the trust, the estate is to be regarded as divided into halves when charges are to be made against it under Subsection 3, one-half charged to Mrs. Howard and her son and the other half to Mrs. Massey and her son, and expenditures from corpus for the benefit of one daughter or for her children will be charged against the one-half of the estate thus set aside to them and the expenditures from corpus for the benefit of the other daughter or her children will be charged against the other half.

Fourth:—At the time Testator made his will, there was an actual need for some provision in the will which would assure to Mrs. Massey and her son the proper maintenance and support, and the necessary and reasonable medical care, aid and assistance and to assure to the son the proper educational advantages which circumstances had demonstrated that Mrs. Massey and her son might not be able to obtain otherwise. It was therefore reasonable for him to have made such a provision against the needs of his beneficiaries as we have held that he did make in Subsection 2.

The only matters which we think it necessary to mention as possibly affording some support for Plaintiffs' construction of the controversial Subsection 2 are the following:

First:—Plaintiffs' construction of Subsection 2, as we have stated, is based in part upon a literal application of the opening words of this subsection, to wit: "In the event the net income from this Trust Estate shall be insufficient * * *". However, this language is but a part of the subsection; and an analysis of the subsection demonstrates that a literal application of the words quoted is improper.

Second:—The net income from the trust estate has been small and will probably continue to be small if the Bank keeps the bulk of the estate invested in Sun Oil Company stock. For the bulk of the dividends paid by this Company, which have been large, have been paid in stock and the Testator provided in Subsection 7 of Section VI of the Fifth article that stock dividends should be credited to principal. The testator, of course, knew that his employer paid dividends in this fashion and thus may be said to have known that if his estate was invested in Sun Oil Company stock it would produce a relatively small net income, an income which would not contribute very much toward the maintenance and support of his daughters to whom, during his lifetime, he had given as much as $3,000 or $4,000 a year. When, then, would he have made Subsection 2 a provision only for need? Why would he have reduced his annual gifts to his daughters from $3,000 or $4,000 a year to the small sums mentioned in our statement from the proof? (And why, again, should we depart from a literal application of the opening words of Subsection 2, quoted above?) The reply, of course, is that Testator did not thus reduce his annual gift; for the proceeds of the insurance policies he procured for his daughters' benefit, plus the net income from the trust estate, even as now invested, add up to a very substantial gift. This gift amounted to $155.60 a month for the year 1948. Furthermore, the Bank need not keep the estate invested in property which yields so low a net income. We are not criticizing the investment policy of the Bank. Under our construction of Subsection 2, this policy seems a very good one, since the large stock dividends are readily salable and postpone a depletion of the basic capital of the estate more than would an investment which did not produce such a large total return. Indeed, if these dividends continue to be as large, they would suffice to provide the beneficiaries with as abundant an income as did Testator's gifts during his lifetime. We are simply point-

ing out that the Bank was not instructed by the testator to keep the estate invested in Sun Oil Company stock and that Sun's dividend policies and the Testator's information concerning these policies and his own investment policy are therefore ambiguous circumstances on this appeal. Still further, there is nothing unreasonable in Testator's having provided a munificent gift for his grandsons, at least when it is borne in mind that he made substantial provision in and outside of his will at the same time for his daughters and, under our construction of Subsection 2, made further provision guarding them against a failure of his own gifts and their other income to provide them with certain basic necessities.

(c) Matters to be considered by the Bank in determining how to exercise the discretion vested in it under Subsection 2:

The determination of whether an expenditure from corpus under Subsection 2 is necessary raises two questions, namely, what income or assets other than the net income from the trust estate shall the Bank consider, and whether an expenditure shall be limited to what is strictly needed. And first, concerning assets available to the beneficiary other than the trust income.

The proof shows different sources of income heretofore available to the beneficiaries. There are the monthly payments made to Testator's daughters under the insurance policies, the earnings of two of the beneficiaries, namely, Mrs. Massey and her son, and the income earned by Testator's sons-in-law. It is not clear to us whether Mrs. Howard received any money from the corporation which owns the Howard grocery. We hold that the Bank, within the limits now to be indicated, ought to take into consideration all of this income in determining how to exercise the discretion vested in it under Subsection 2.

■ However, the circumstances hereinbefore related show that Testator's daughters were not expected by him to earn their own livelihood, and that they were not accustomed to doing so during the Testator's lifetime. These circumstances are of especial significance because the expenditure authorized in Subsection 2 is for

the proper maintenance and support of the beneficiaries and (bearing in mind the object of Subsection 2) this would seem to be the sort of maintenance which they were accustomed to receive during Testator's lifetime. See: McCreary v. Robinson, 94 Tex. 221, 59 S.W. 536. Therefore the Bank, in exercising its discretion under Subsection 2, has no right to insist upon Testator's daughters continuing to work and earn their livelihood or to contribute toward the cost of it. The daughters have the right to stop work and to require of the Bank that deficiencies in the income available to them for support and maintenance be supplemented by expenditures out of corpus. On the other hand, if the daughters do elect to work and to earn money, the Bank ought to take into consideration the earnings actually received by them. As concerns Mrs. Howard, if money is paid to her by the family corporation, whether as dividends or as salary, this income ought to be taken into consideration by the Bank; but if no money is paid to her, then the Bank will look to the income of her husband which is available to her.

These conclusions apply to Testator's grandsons in the same degree that they apply to Testator's daughters.

■ Income earned by Testator's sons-in-law is not under the control of the beneficiaries, and it may be considered by the Bank only to the extent that Testator's beneficiaries can reasonably depend upon it to provide them with the matters specified in Subsection 2. The proof related above shows, of course, that this income is and will be fully available, as far as it will go, to meet these purposes.

We have so far mentioned only sources of income. There is also proof of capital assets owned by beneficiaries and by Testator's sons-in-law. It appears that Mrs. Howard owns some stock in the Corporation which operates the Howard grocery. It also appears that Mr. Howard owns property and that Mr. and Mrs. Massey own some property, although the proof does not show how the title to this property is vested as between them.

In determining whether the Bank ought to take these capital assets into considera-

tion in considering how to exercise its discretion under Subsection 2 we must keep in mind the nature of the provision made in this subsection, and that the beneficiaries, who are married women and minor children, do not have full legal capacity.

■ We hold that the Bank cannot take into consideration, in determining how to exercise its discretion under Subsection 2, capital assets which are owned by Testator's sons-in-law, except to the extent that these persons may have set these assets aside and actually made them available to meet the purposes specified in Subsection 2, and then only so long as they allow these assets to be and remain available for said purposes. Thus the Bank cannot require either Mr. Howard or Mr. Massey to sell capital assets and expend the proceeds upon the beneficiaries; nor can the Bank insist that Mr. Howard or Mr. Massey, having indicated an intention to expend such proceeds upon the beneficiaries, not change his mind and direct the fund to another purpose. Testator's sons-in-law are not under the control of the Bank, and Testator never intended that the Bank's discretion to aid his beneficiaries be made dependent upon the consent of an independent agency. Otherwise, his attempt to protect his beneficiaries might be defeated.

■ We hold that the Bank can take into consideration capital assets owned by the beneficiaries only to the extent that the asset has been reduced to the control of the beneficiary, and only so far as it will not reduce the beneficiary's standard of living below that provided for in Subsection 2. Mrs. Howard does not fully control the stock she owns in the corporation operating the Howard grocery since under art. 4614, R.S.1925, as amended, Vernon's Ann.Civ. St. art. 4614, she cannot sell this stock without the consent of the husband; and therefore, as long as she does not have full power of sale the Bank ought not to take this asset into consideration.

■ To these remarks concerning matters which the Bank should consider in exercising its discretion under Subsection 2 we make the following qualification:—All of the purposes specified in Subsection 2

upon which corpus might be expended are necessities to people such as Testator's beneficiaries, and two of them, namely, maintenance and support and medical care are absolute necessities in any case. The Testator intended that his beneficiaries be provided with these things no matter what their financial condition was and without regard to how they had conducted themselves before some particular need became manifest. Furthermore, Testator intended that relief be speedily afforded. Taking into account income and capital assets require long range planning, and the plans laid may fail. Income reasonably to be expected may not accrue; and capital assets may be difficult and slow to sell. It may even occur that a beneficiary has been wasteful. Nevertheless, in each of these cases it was the intention of Testator that his beneficiaries be provided with the matters specified in Subsection 2; and in no case can income or capital assets be considered by the Bank when to do so would be to unreasonably delay the furnishing of, or to unreasonably limit the amount of the funds required to meet the purposes specified in Subsection 2.

■ The Bank, of course, may require of the beneficiaries such information as it may need to exercise its discretion; and in the case of a misuse by a beneficiary of funds taken out of the corpus of the estate, may doubtless take some appropriate step to prevent future wastage.

■ Finally, considering whether an expenditure from corpus shall be limited to what is strictly necessary:—Plaintiffs have only prayed an award for their proper support and maintenance, but we note that in the case of each purpose specified in Subsection 2 for which corpus might be expended, the Testator has prescribed the quantity and the quality of that which should be furnished his beneficiaries. Thus, corpus may be expended to "properly maintain and support" his beneficiaries, and when we consider the object of Subsection 2, Testator must have intended by the word "properly", to refer to the sort of maintenance and support which he knew of his daughters having, and not according to what might be strictly needed to keep his

beneficiaries alive, clothed and housed. In other words, Testator wished to assure his beneficiaries to have at least as good maintenance and support as they had during his lifetime.

(E) These comments sufficiently indicate our construction of the controversial Subsection 2 as regards the questions made on this appeal; and we proceed to consider the trial court's award of money to Testator's daughters.

 Subsection 2 purportedly vests an absolute discretion in the Bank as Trustee, but such a provision will not always be literally enforced. An act alleged by the Bank to be an exercise of this discretion will be reviewed to determine whether the Trustee acted in the state of mind in which Testator contemplated that the Trustee should act. Certainly this may be done here, where there are objective standards by which to test the quality of the Trustee's conduct concerning each of the three purposes specified in Subsection 2 toward which an expenditure of corpus is authorized. See concerning this and other matters discussed in this subdivision of our conclusions of law: Scott on Trusts, Sections 187 et seq.

 The burden was on the plaintiffs to show that the Bank, that is, the Trustee, did not act in the state of mind in which the Testator contemplated that said Bank should act.

We have referred in Paragraph 6 of our statement of proof to the fact that the Bank finally purported to exercise its discretion when it filed its amended answer on October 5, 1948, although it had not done so prior to that date. According to this pleading, the Bank denied plaintiffs any expenditure of corpus upon the sole ground that none was necessary, because of other income available to plaintiffs.

 The Bank's conclusion regarding Mrs. Howard is supported by the proof; the evidence does not support the trial court's judgment to the contrary. So far as the proof shows, the Howards have a good income, which suffices to meet all of the purposes specified in Subsection 2. It is also apparent from the proof summarized in paragraph 6 of our statement of proof that Mrs. Howard expects to use her award, not for her own maintenance and support but for the education of her son. The trial court has approved this construction of Subsection 2, but we hold to the contrary. The Bank, in exercising its discretion under Subsection 2, may only consider the individual requirements of the particular beneficiary for whom an expenditure of corpus is to be made. Thus an award for Mrs. Howard's benefit ought not to include provision for her son; it ought to include only a provision for Mrs. Howard. The son of Mrs. Howard is independently provided for in Subsection 2, and under proper circumstances, entitled to an independent award, in his own behalf, for his own support and maintenance.

 The Bank's conclusion regarding Mrs. Massey is not supported by the proof, and must be held to be arbitrary. There is no basis whatever in the evidence for the Bank's refusal to make an allowance for Mrs. Massey's maintenance and support, even under the Bank's construction of the controversial Subsection 2; and the Bank has quite evidently mistaken its duty under the circumstances and misconstrued the extent of its authority under Subsection 2. It is plain that the Massey family is in hard circumstances, even with the earnings of Mrs. Massey and her son; and if these beneficiaries elect to stop working and earning money, as they have a right to do, under our construction of the will, an expenditure out of corpus for their maintenance and support will be strictly necessary. Mrs. Howard's testimony, indicating that Mrs. Massey would expend her award upon her son's education, is not only very indefinite; it is also hearsay and therefore incompetent as proof. Although the matter is not in issue on this appeal, we think it proper to say that the Bank should give consideration to the making of an award out of corpus for the proper maintenance and support of Mrs. Massey's son, Robert Lee Massey, and for Robert Lee Massey's attendance upon a college.

These comments suffice to show that the award in behalf of Mrs. Howard must be reversed; and since the parties tried the

cause upon a construction of the will with which we have disagreed and because the proof regarding Mrs. Howard's case may not be fully developed, this phase of the judgment will be remanded.

We have concluded that the award in behalf of Mrs. Massey may stand. The appellants have not attacked the amount of the award and we need not consider whether the amount is right. The Bank was not shown to have exercised its discretion under Subsection 2 prior to October 5, 1948, the date of the second hearing in the trial court, but this act of the Bank may be regarded as having a retrospective as well as a future operation. The Bank, in effect, denied that Mrs. Massey was entitled to an award by reason of anything which had occurred prior to Otober 5th, and thus its exercise of discretion extended over the entire period covered by the trial court's award, namely, the period beginning on March 1, 1948, and ending on October 15, 1948.

Since the Bank's denial of an award to Mrs. Massey was wholly arbitrary, and as we have said, evidently predicated upon a mistaken view of its duty and authority, the Bank did not act in the state of mind in which Testator contemplated that his Trustee should act, and in effect never exercised the discretion which was vested in it under Subsection 2. The Bank's conduct regarding Mrs. Massey is therefore reviewable.

 The trial court's award of attorneys' fees and of compensation to the guardians ad litem has not been attacked, and we have therefore allowed it to stand. In the future, the trial court should consider not only the importance and difficulty of the issues involved; the trial court should also require evidence of, and should take into consideration, the actual cash value of the particular lawyer's time, as measured by the individual's earnings, and the trial court ought also to require that the particular lawyer to whom an award is to be made show, at least roughly, how much of his time has been consumed in representing his client in the litigation before the court. In the business world such matters are taken into consideration in

fixing lawyers' fees, and they ought also be considered by the court in cases like this.

To the extent indicated above the appellants' Points of Error are sustained. The judgment of the trial court is reversed in so far as it construes the will of Mr. Nowery, and judgment will be entered here construing said will as hereinfore indicated. The judgment of the trial court is also reversed in so far as it awarded Mrs. Howard $300 a month for the period beginning on March 1, 1948, and ending on October 13, 1948, and this phase of the judgment is remanded to the trial court. The balance of the trial court's judgment is affirmed.